IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ESTEBAN HERNANDEZ GALLARDO,<br><br>Plaintiff,<br><br>v.<br><br>ROSEMARY NDOH,<br><br>Defendant. | Case No. 18-cv-01683-CRB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Esteban Gallardo, a state prisoner incarcerated at Avenal State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a conviction and sentence from Santa Clara County Superior Court. Pet. (dkt. 1) at 21–56. In an order filed on March 19, 2018, the Court found that the petition, when liberally construed, states cognizable claims for relief under § 2254, and ordered Respondent to show cause why a writ of habeas corpus should not be granted (dkt. 3). Respondent filed an answer to the order to show cause, see Ans. (dkt. 10-1), and Gallardo filed a traverse, see Trav. (dkt. 13). As set forth below, the petition is DENIED.

I.      **BACKGROUND**

A.      **Statement of the Case**

On October 19, 1993, the Santa Clara County District Attorney filed a complaint against Gallardo, charging him with one count of lewd and lascivious conduct upon a child and two counts of continuous sexual abuse of a minor. Pet. at 10. The government took steps to locate Gallardo following the issuance of the state felony complaint but was not

able to find him.  Ans. (dkt. 10-9) Ex. F (California Court of Appeal Opinion) at 153.  The address that either Gallardo or his employer provided was not a real address.  Id. at 157.  At some point after October 1993, Gallardo began living under the false name, "Jesus M. Gomez."  Id. at 158.

Eighteen years later, on September 30, 2011, Gallardo was arrested on an unrelated matter.  Pet. at 10.  During the pre-booking process, police learned that Gallardo possessed a California driver's license with the false name, "Jesus M. Gomez."  Id.  Gallardo signed a pre-booking form under that name.  Ans. Ex. F at 153.  Police discovered Gallardo's outstanding warrant for the instant case when they entered Gallardo's fingerprints into the fingerprinting identification system.  Id.  Police then arrested Gallardo on the 1993 charges.  Id.

On April 10, 2013, trial began for the 1993 charges.  Id. at 158.  On April 26, 2013, the jury found Gallardo not guilty of Count One, and guilty of Counts Two and Three.  Id. at 143.  Gallardo was sentenced to thirty-two years in state prison.  Id.  Gallardo was also ordered to pay $10,115 in restitution to the victims through the Victim Compensation and Government Claims Board.  Ans. (dkt. 10-4) Ex. A (Order for Restitution) at 229–34.

On April 13, 2016, the California Court of Appeal denied Gallardo's appeal, which had argued that the trial court violated his rights to due process and a fair trial.  Ans. (dkt. 10-9) Ex. C at 10.  On July 20, 2016, the California Supreme Court denied Gallardo's petition for review.  Pet. (dkt. 1-1) Ex. 2 at 29.  On March 20, 2017, the United States Supreme Court denied Gallardo's petition for a writ of certiorari.  Pet. (dkt. 1-1) Ex. 3 at 31.

**B.    Statement of the Facts**

The California Court of Appeal summarized the facts of the case as follows:

1.    The Prosecution Case

1.    Victim 1

Victim 1 was born in 1982, and was 30 years old at the time of trial.  As a child, victim 1 lived in a one-bedroom apartment in San Jose with her older sister

(victim 2), their mother, grandmother, aunts, uncles, cousins and Gallardo, a friend of the family. Some of the household members slept in the bedroom while others slept in the living room. Victims 1 and 2 slept in a bedroom with their mother, grandmother, cousins, and Gallardo. The room had a queen size bed and bunk beds, and in all, about 10 people slept there. The two victims, their mother, and Gallardo slept on the floor on a blanket. Though he occasionally left the house for a few days, Gallardo was otherwise always around.

Victim 1 was unable to recall exact dates, but estimated her age and when the molestations occurred. At some point, she and her family moved to another apartment and by that time, she believed the molestations had gone on for a couple of years. Victim 1 never talked to victim 2 about what Gallardo was doing at the time, but may have talked about it once when she was around 12 years old. At that point, the molestation had stopped and Gallardo was no longer living with their family.

During a conversation with her sister in 1993, victim 1 discovered victim 2 had also been molested by Gallardo. They decided to report what happened to an adult. They first told their mother's boyfriend, Sergio Tabares, and then told their mother. Victim 1 was subsequently interviewed at her school by a police officer. She did not talk to her sister about the molestation again, however, and testified she was absolutely certain Gallardo had molested her.

2. Victim 2

Victim 2 was born in 1981 and, at the time of trial, was 31 years old. She is one year older than her sister, victim 1. She testified she grew up in a one-bedroom house in San Jose with victim 1, their mother, grandmother, uncles, aunt, and Gallardo. She recalled half of the people in the house slept in the living room and the other half in the one bedroom.

Victim 2 slept in the bedroom with her mother, sister, grandmother and aunt, but she testified Gallardo did not sleep in that room with them. When asked why he was staying with them, she said she assumed Gallardo was a friend of the family, and she recalled he lived with their family for years. Victim 2 could not recall how old she was or what grade she was in when Gallardo first moved in. She never saw Gallardo molesting victim 1 in the bedroom.

When she was a little girl, maybe between six and nine years old,[1] Gallardo touched her in a way she did not like. Victim 2 admitted she did not have a precise memory of her age or how long ago the molestation occurred, but she believed it lasted two years.

---

[1] Victim 2 later testified she was in seventh grade when Gallardo molested her.

The first time Gallardo touched her was when she was on the couch in the living room watching television. Gallardo told victim 2 to go behind the couch and take off her clothes. He then kissed her breasts, took off her underwear and tried to put his penis in her vagina. The tip of his penis went between the lips of her vagina. Victim 2 told Gallardo it hurt and asked him to stop, but Gallardo told her, "one more time." She tried to move away, but could not completely get away from him. After Gallardo molested victim 2, he told her to watch television and not to turn around. He then took victim 1, who was in the room watching cartoons, behind the couch with him.

Gallardo molested victim 2 every time he was alone with her or when others were at work, but all of the molestations occurred during the day. He told her to tell her mother that she was sick so victim 2 would stay home from school. Victim 2 did so, but she did not want to stay home with Gallardo alone.

The second incident she recalled occurred in the bedroom during the day. Gallardo took off her pants and put his penis on top of her vagina, rubbing it between the lips without penetrating her. Victim 2 did not know what he was doing and said she did not have an understanding about sex or sexual acts at that time.

Gallardo frequently licked or kissed her breasts, but did not put his fingers in her vagina. One time, he put his tongue or his mouth on victim 2's vagina. He told her to take off her pants and underwear, but they would be under some covers so victim 1, who was also home watching television or coloring, would not see. Victim 2 testified Gallardo would touch her in a sexual way "[e]very chance he would get," frequently caressing her head and then asking her to lie down.

Victim 2 and her family eventually moved and Gallardo did not live with them in their new residence. She recalled the molestations occurring during the school year and lasting for a while. One summer while in elementary school, victim 2 went on a trip to Mexico with her family, including victim 1. She could not recall if Gallardo still lived with them after that trip.

After her family moved, victim 2 spoke with her sister about what Gallardo had done to them. That same day, the two girls told their mother's boyfriend, Tabares, and then told their mother about Gallardo. Victim 2 recalled being interviewed by a therapist, rather than a police officer. On cross-examination, victim 2 said she remembered being interviewed by a police officer but could not recall any details about that interview, which took place two to three years after the molestation. She did not recall if her sister was there during the interview or if she was present when victim 1 was interviewed.

Since that first discussion with her sister, victim 2 has not talked to victim 1 about what Gallardo had done to them. Victim 2 did not know why she had not told

her sister while the molestation was happening. She did not know it was a bad thing, but she was scared. She was absolutely certain Gallardo had molested her and the abuse was continuous until they moved.

### 3. Arthur Serenil

Serenil, a retired San Jose police officer, testified at trial. He was serving in the military in Iraq in 2003 when he sustained injuries which affected his memory. Serenil was a detective in the sexual assault unit from 1990 to 1993. While he was part of that unit, he interviewed two sisters, victims 1 and 2, at Castro Middle School in 1993. Serenil interviewed the girls separately in the principal's office, although the principal was present during each interview. Serenil testified generally about his training and the techniques he used when interviewing children in sexual assault cases, such as building rapport with the child, avoiding leading questions, and focusing on big events in their lives in order to determine the timing of particular incidents. Although he could not independently recall the interviews with victims 1 and 2 apart from the police reports, Serenil assumed he applied those techniques.

According to the police report, victim 2 told Serenil that Gallardo first molested her when she was nine years old. Victim 1 reported the first molestation by Gallardo occurred when she was seven or eight years old. Victim 1 told Officer Serenil that she was "raped" "a lot by [Gallardo] when she was ten years old." Serenil also interviewed the victims' grandmother, their mother, and one of their cousins,[2] during the investigation of the case.

### 4. Miriam Wolf

Wolf, a licensed clinical social worker, testified about CSAAS [Child Sexual Abuse Accommodation Syndrome, which seeks to explain common reactions of children to molestation or rape]. According to Wolf, CSAAS first appeared in a 1983 article, authored by Dr. Summit,[3] in a journal on child abuse and neglect. The article described patterns of behaviors observed in children who were victims of abuse and sought to dispel common myths about how children behave in these situations. It was not a research article nor was it intended for use as a clinical diagnostic tool to determine if a child was, in fact, abused or molested. Wolf was not involved in the investigation of this case and did not review the police reports which were prepared in that investigation. She was not aware of what the victims said and could not offer an opinion on the accuracy of their statements or whether Gallardo was guilty or not.

---

[2] This cousin was called as a defense witness.
[3] Dr. Summit's full name does not appear in the record.

Wolf explained to the jury that the five patterns of behavior in CSAAS are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted or unconvincing disclosure; and (5) retraction. Secrecy involves children not disclosing sexual abuse right away, often waiting long periods of time to do so. Helplessness occurs when there is a child victim and someone who is older or in a position of power. There is a developmental, physical, and psychological or emotional helplessness on the part of the child. A child experiences helplessness because they feel they cannot go to the people they would normally turn to for help. Delays in disclosures are more common when the abuser is a family member or someone close to the family.

Wolf testified that the concept of entrapment and accommodation in CSAAS involve children feeling trapped in their situation and figuring out a way to live normally while the abuse is occurring. She explained that delayed, conflicted or unconvincing disclosure means that the disclosures do not occur all at once but instead come out a little at a time, often hesitatingly and conflicted especially if the abuser is someone they know and trust. It has been documented that when making disclosures of abuse, children get confused, mix up dates, or are unable to give dates and times. Retraction, the final element of CSAAS, involves children recanting their statements when they experience the negative consequences that result, such as a loved one being arrested, the child having to leave home, or family members becoming upset and blaming them.

According to Wolf, since the initial publication of his article, Dr. Summit has expressed concerns that his article has been misused and the term "syndrome" is a misnomer. In a subsequent article published in 1994, Dr. Summit, a psychiatrist, regrets using "syndrome" in describing his observations because he believes it leads people to use CSAAS as a diagnostic tool.

B.      Defense case

1.      Dr. Bruce Yanofsky

Dr. Yanofsky, a clinical and forensic psychologist, testified about his psychological evaluation of Gallardo. In preparing for his evaluation, Dr. Yanofsky reviewed the records in Gallardo's case and the victims' testimony from the preliminary hearing before conducting a clinical interview with Gallardo and subjecting him to several objective psychological tests. Based on that evaluation, Dr. Yanofsky opined that Gallardo did not "present[] with any mental health diagnosis or conditions that would predispose him to sexual crimes of any sort." In all, Dr. Yanofsky spent approximately 10 hours with Gallardo in two clinical interviews and performed eight psychological tests.

Dr. Yanofsky testified that Gallardo's IQ test indicated he was of below

average intelligence, principally because of his lack of education and illiteracy. Dr. Yanofsky also conducted an extensive test on Gallardo designed to measure the sexual characteristics of an adult male alleged to have committed a sex offense.[4] The results of this test indicated Gallardo's commonality with a group of known child molesters was very low.

Gallardo also scored low on a test for determining psychopathy, and Dr. Yanofsky testified this result indicated Gallardo was not the type of person who would likely engage in cruel, callous, violent or sexually violent behavior, nor was he someone who would feel no remorse or guilt. Gallardo's self-reported sexual history did not disclose a sexual interest in children and his relationships have been "age-appropriate consensual relationships."

On cross-examination, Dr. Yanofsky agreed that a person can molest a child and not be diagnosed as a pedophile. He indicated it is difficult, based on a psychological profile alone, to determine whether or not someone is a sexual criminal. Based on Gallardo's psychological profile, he was not a pedophile, but Dr. Yanofsky clarified he was not opining whether Gallardo did in fact commit the molestations in this case.

## 2. Victims' older cousin

The victims' cousin, who was born in 1974, lived with the victims in 1991. She first arrived in the United States in 1990 and has known Gallardo since that time. The last time the victims' cousin saw Gallardo was at a family party in 2010. She recalled that when she was 16 years old, Gallardo lived at her aunt's house for awhile but later moved out. Gallardo slept in the living room and never tried to touch her in a sexual way. He would often give her a ride to her part-time job on the weekends, but never touched her or acted in a way that made her uncomfortable.

The victims' mother took her to the police in September 1993 to be interviewed about Gallardo. The cousin denied telling police during that interview that Gallardo continually tried to touch her in a sexual way and the only reason he did not was because she had stopped him. She also denied telling police Gallardo had thrown an adult magazine at her after she had returned from a trip to Mexico, and denied ever having gone back to Mexico after she moved to the United States. She denied having told the police that Gallardo tried on at least three occasions to touch her arm close to her breast while giving her a ride to work. The victims' cousin indicated she never made any of the statements attributed to her in the 1993 police report.

---

[4] Gallardo was asked to sign a consent form for this test, and in doing so, signed the name, "Jesus Gomes." However, discussed below, Gallardo also went by "Jesus Gomez." Which was the name on the driver's license in his possession at the time of his arrest, as well as how he signed a prebooking form.

### 3. Dr. Rahn Minagawa

Dr. Minagawa, a clinical and forensic psychologist, testified about CSAAS for the defense. Dr. Minagawa indicated that CSAAS has been subject to some criticism in the field of psychology, with a number of articles questioning whether CSAAS is a syndrome, and whether it qualifies as science. The five elements associated with CSAAS are not always present and the descriptions of some of the elements, such as delayed reporting, are vague. Delays could be based on different facts of the child such as age and environment. According to Dr. Minagawa, one of the problems with using CSAAS in the legal setting is that it can confuse individuals who are not familiar with scientific principles and who may consequently give it more weight than it deserves. CSAAS has not been accepted as a real syndrome and it assumes that abuse, in fact, has occurred.

### 4. Aracely Maldonado

Maldonado, Gallardo's niece, testified she has known Gallardo since she was five years old. He would live with her family for several months, leave and then return to live with them. Maldonado recalled he lived with them in 2002 or 2003 when she was 15 or 16 years old. Gallardo never tried to touch her in a sexual way. Although the two victims are her cousins, they are not very close and she is four or five years younger than them.

Maldonado thinks she saw Gallardo when she attended her aunt's funeral three or four years ago. She testified that the two victims were also at the funeral. The last time Maldonado saw Gallardo was one or two months before he went to jail. She considers her relationship with him to be close and does not believe he is the kind of person who would molest children.

When she was about 18, she learned that Gallardo was going under the name, "Jesus Gomez."[5] She was confused by this but never asked her mother about it because it was "none of my business." Although she was not close to the victims, she did not know them to be liars or to make up things against people.

### A. Verdict and sentencing

On April 26, 2013, the jury found Gallardo not guilty on the charge of lewd and lascivious conduct on a child under age 14 (§ 288, subd. (a), count 1), but guilty of two counts of continuous sexual abuse of a child (§ 288.5, subd. (a), counts 2 & 3). Gallardo was sentenced to a total term of 32 years in prison on counts 2 and 3 [counts 2 and 3 involved the continuous sexual abuse of victims 1 and 2,

---

[5] See footnote 5, ante.

respectively, Ans. (dkt. 10-4) Ex. A (Verdict of the Jury) at 135–36].

## II.    DISCUSSION

### A.    Standard of Review

The Court may entertain a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Court may not grant a writ with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

9

While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

### B. Claims

Gallardo asserts five bases for habeas relief. He alleges: (1) that the delay in his prosecution violated his Sixth Amendment and due process rights to a speedy trial; (2) that the trial court erred in limiting Dr. Bruce Yanofsky's testimony; (3) that the trial court erred in permitting expert testimony regarding CSAAS; (4) that the trial court erred by excluding evidence that Victim 1 had been molested by a different person, and; (5) that the cumulative error prejudiced Gallardo, rendering the "resulting criminal trial fundamentally unfair." Pet. at 21–48. The Court disagrees as to all bases.

### 1. The eighteen-year delay between the state felony complaint and the arrest

Gallardo argues that the eighteen-year delay between the government's issuance of the state felony complaint and his arrest violated his Sixth Amendment and due process rights to a speedy trial. Pet. at 28–32. The California Court of Appeal held that the trial court did not violate Gallardo's right to a speedy trial because Gallardo caused the delay in his prosecution and the delay did not prejudice Gallardo. Ans. Ex. F at 157–58.

The California Court of Appeal was reasonable in holding that the delay did not violate Gallardo's right to a speedy trial. First, the filing of the state felony complaint against Gallardo in 1993 did not necessarily trigger a right to speedy trial. See United States v. Marion, 404 U.S. 307, 319 (1971). Second, even if Gallardo was entitled to a speedy trial, Gallardo waived the right because he caused the delay in his prosecution by eluding law enforcement. See United States v. Manning, 56 F.3d 1188, 1195 (9th Cir.

1995). Finally, the delay in Gallardo's prosecution did not prejudice him because the unavailable witnesses were not material to his defense. See Barker v. Wingo, 407 U.S. 514, 532 (1972).

### a. Triggering the Right to a Speedy Trial

A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to the Constitution and imposed on the states by the Due Process Clause of the Fourteenth Amendment. Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).

The United States Supreme Court has not ruled on whether a state felony complaint triggers an accused's right to a speedy trial. The speedy trial provision of the Sixth Amendment is triggered when either a "formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." Marion, 404 U.S. at 320. In interpreting Marion, the California Supreme Court held that the "filing of a felony complaint is by itself insufficient to trigger speedy trial protection." People v. Martinez, 22 Cal. 4th 750, 755 (2000). However, Marion does not actually say whether a state felony complaint constitutes "a formal indictment or information . . . " Marion, 404 U.S. at 320. Marion suggests that a state felony complaint might be enough to trigger the right because the right is an "important safeguard . . . to minimize anxiety and concern accompanying public accusation." See id. at 320. A state felony complaint is arguably a "public accusation" that triggers the right to a speedy trial. See id.

In a more recent case, the United States Supreme Court held that the right to a speedy trial "protects the accused from arrest or indictment through trial." Betterman v. Montana, 136 S. Ct. 1609, 1612–13 (2016). Betterman builds on Marion's reasoning by holding that the right to a speedy trial "does not attach until . . . a defendant is arrested or formally accused." Id. at 1613. Still, Betterman does not answer whether a state felony complaint is a "formal accusation." See id.

Further, the Ninth Circuit is divided as to whether the government's issuance of a state felony complaint triggers the right to a speedy trial. Favors v. Eyman, 466 F.2d 1325,

1327 (9th Cir. 1972), held that the "rationale of <u>Marion</u> requires that we hold that [defendant's] Sixth Amendment right to a speedy trial did not attach when the complaint was filed." By contrast, <u>United States v. Terrack</u>, 515 F.2d 558, 559 (9th Cir. 1975), held that the "filing of a criminal complaint, or the indictment where there is no complaint, marks the inception of the speedy trial guarantee of the Sixth Amendment." Recently, <u>Mann v. Beard</u>, 649 Fed. Appx. 392, 393 (9th Cir. 2016), recognized the Ninth Circuit's split and held that "the Supreme Court has not decided whether the filing of a felony complaint is sufficiently analogous to an indictment or information to trigger the protections of the Sixth Amendment Trial Clause." <u>Mann</u> reasoned that because the Supreme Court has not addressed the question of whether a felony complaint triggers the Sixth Amendment Speedy Trial Clause, state courts ruling that state felony complaints do not trigger the right to a speedy trial cannot be "contrary to clearly established federal law." <u>Id.</u>

Here, the California Court of Appeal did not "unreasonably [apply or act] contrary to clearly-established federal law" in the absence of controlling Supreme Court precedent and in light of the division within the Ninth Circuit. <u>See</u> <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004) (holding that where there is no Supreme Court precedent controlling a legal issue raised by a petitioner in state court, a state court's decision cannot be "contrary to, or an unreasonable application of, clearly-established federal law").

### b. The Barker Test

Even if the right to a speedy trial did attach with the filing of the state felony complaint, under <u>Barker</u>, Gallardo waived that right when he eluded law enforcement. <u>See</u> Ans. Ex. F at 157–58; <u>Barker</u>, 407 U.S. at 522.

Courts analyzing a right to a speedy trial violation must apply a flexible "functional analysis" and weigh the following factors: (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of his right; and (4) prejudice to the defendant. <u>Barker</u>, 407 U.S. at 530. No per se rule governs whether the right to a speedy trial has been violated. <u>Doggett v. United States</u>, 505 U.S. 647, 651 (1992); <u>Barker</u>, 407 U.S. at 530; <u>United States</u>

v. Lam, 251 F.3d 852, 855 (9th Cir. 2000), amended, 262 F.3d 1033 (9th Cir. 2001).

### i. Length and Reason for the Delay

The Ninth Circuit considers the second Barker factor, the reason for the delay, the "focal inquiry." United States v. King, 483 F.3d 969, 976 (9th Cir. 2007) (citing United States v. Sears, Roebuck & Co., 877 F.2d 734, 739–40 (9th Cir. 1989)). Courts must consider "whether the government or the criminal defendant is more to blame" for the delay. Doggett, 505 U.S. at 651. The government's deliberate delay "'to hamper the defense' weighs heavily against the prosecution." Vermont v. Brillon, 556 U.S. 81, 90 (2009) (quoting Barker, 407 U.S. at 531). "In contrast, delay caused by the defense weighs against the defendant . . . under standard waiver doctrine." Brillon, 556 U.S. at 90. The Barker test does not apply if the delay can be attributed to affirmative steps by the defendant to escape detection by law enforcement. Barker, 407 U.S. at 530. Additionally, defendants may be deemed to have waived their speedy trial rights entirely where they resist government efforts to secure their presence in the United States. See Lam, 251 F.3d at 859 n.10. A defendant's conduct in eluding law enforcement "constitutes an intentional relinquishment of his right to a constitutional speedy trial." Manning, 56 F.3d at 1195. A defendant's "affirmative resistance of the government's efforts to secure his presence" constitutes a waiver of the right to speedy trial and he "cannot now complain of the delay that he himself caused." Id.

Here, Gallardo waived his right to a speedy trial. While the length of the delay here was substantial, the reason for the delay weighs against Gallardo. See Barker, 407 U.S. at 534 (noting that a delay of four years from arrest to trial was extraordinary). The eighteen-year lag between the state felony complaint and Gallardo's arrest was extraordinary because of his conduct in evading law enforcement. Ans. Ex. F at 153; see also Barker, 407 U.S. at 534. Investigators took steps to find Gallardo after the government issued the state felony complaint but they could not find him. See Ans. Ex. F at 157. Eighteen years later, Gallardo was arrested in an unrelated matter while in possession of a California driver's license under the false name of "Jesus M. Gomez." Id. at 158. Both Gallardo and

the government agree that Gallardo asserted his right to a speedy trial only after his arrest. Trav. at 21; Ans. at 22.

Gallardo committed an "intentional relinquishment of his right to a constitutional speedy trial" after he eluded law enforcement by failing to provide them with a correct home address. See Manning, 56 F.3d at 1195. During Gallardo's trial, Detective Serenil testified "that he asked Gallardo for a new address since he had apparently moved, but Gallardo could not give him one." Ans. Ex. F at 157. Detective Serenil added that "the Sunnyvale police department attempted to locate Gallardo at a specific address, provided by either Gallardo or his employer, but determined that there was no such address in Sunnyvale." Id. Detective Serenil further testified "that he was informed by someone that Gallardo had fled to Mexico," though Detective Serenil did not note of who had told him about Gallardo's whereabouts and had no independent recollection of that conversation. Id.

Gallardo added to the delay by living under the alias "Jesus M. Gomez" and "going so far as to procure a driver's license with that alias." Id. at 158. On September 30, 2011, Gallardo was arrested in an unrelated matter. Id. During the pre-booking process, police found Gallardo "carrying a California driver's license in the name of 'Jesus M. Gomez' and that is the name he signed on a prebooking form." Id. Law enforcement discovered Gallardo's real identity and outstanding state felony complaint only once they ran his fingerprints. Id. During the March 2013 trial, Aracely Maldonado, Gallardo's niece, corroborated Gallardo's use of the alias after she testified that "about seven years prior." Id. at 152.

The evidence shows that Gallardo, not the government, was responsible for the delay. See Manning, 56 F.3d at 1195.

### ii.    Prejudice to Gallardo

Moreover, Gallardo fails to demonstrate that the delay prejudiced him. Gallardo argues that the eighteen-year delay in his prosecution was prejudicial because certain key witnesses to his defense died or moved away and could not be located. Pet. at 34.

Gallardo also argues that the deterioration of Officer Serenil's memory harmed his defense.  Id.

The delay was not prejudicial because Gallardo's list of potential but unavailable witnesses were not material to his defense.  See Ans. Ex. F at 157.  First, Gallardo argues that the victims' grandmother could have testified that she did not believe Gallardo was capable of molesting the victims.  Pet. at 24.  However, Gallardo bases his argument on a response the victims' grandmother made on September 24, 1993, when investigators questioned her about allegations that Gallardo had molested two different girls, "including the victims' older cousin."  Ans. F. at 155.  It is therefore speculation what the victims' grandmother would have testified regarding the allegations Victims 1 and 2 made against Gallardo.  Id.

The second missing witness is Ms. Cole,[6] who was the school principal present when Officer Serenil interviewed Victims 1 and 2.  Pet. at 27–28.  Ms. Cole could have potentially provided testimony about Officer Serenil's interviewing techniques.  Pet. at 28.  When Gallardo tried to locate Ms. Cole as a potential witness, school officials could not remember Ms. Cole or help in locating her.  Id.  Assuming Ms. Cole could recall the events, it is just as likely that Ms. Cole's testimony would have supported the government's case.  See id.  Again, Gallardo only speculates as to what Ms. Cole would have said.  See Ans. Ex. F at 157.

The third missing witness is Maria Placer, the Child Protective Services worker who was the original reporting party.  Id.  In Ms. Placer's report, the victims stated that Gallardo molested them during a time when Gallardo was in prison.  Id.  Because Gallardo could not locate Ms. Placer, he was unable to introduce evidence that the molestations occurred at a time when Gallardo lacked the opportunity.  Id.  However, Ms. Placer's testimony would not have made a difference to Gallardo's defense.  See id.  During the trial, Gallardo solicited testimony from the victims about the dates on which Gallardo

---

[6] Officer Serenil's written report did not include Ms. Cole's first name.

allegedly molested them.  See Ans. (dkt. 10-6) Ex. B (Transcript of Victims' Testimonies) 136, 173.  Gallardo was able to argue based on the victims' testimony that Gallardo was in custody at the time and could not be guilty.  See Ans. Ex. F at 157.

Gallardo has failed to do more than speculate as to what any of the potential witnesses would have testified.  Gallardo also had the opportunity to use other available witnesses, Gallardo's niece and Dr. Yanofsky, to testify about whether Gallardo was the type of person who would molest a child.  See id. at 155.

As to the deterioration of Officer Serenil's memory due to the passage of time and head trauma, Officer Serenil was able to refresh his memory by reviewing police reports. Id. at 156.  Gallardo also had the opportunity to cross-examine Offer Serenil about his memory, his interviewing techniques, and whether he used proper interviewing techniques in 1993.  Id.  Finally, the jury was able to evaluate Officer Serenil's testimony after Gallardo's cross-examination.  Id.

Given the information available to the trial court on March 29, 2013, it was reasonable for the California Court of Appeal to conclude that the trial court did not abuse its discretion in finding no prejudice resulting from the delay in Gallardo's prosecution. Even if the state felony complaint triggered Gallardo's right to a speedy trial, Gallardo caused the delay in his prosecution.  Gallardo therefore waived his right to a speedy trial. See Barker, 407 U.S. at 534.  Additionally, under Barker, Gallardo failed to prove that the delay in his prosecution prejudiced him.  See id.

### 2. The trial court limitations on Dr. Bruce Yanofsky's testimony

Gallardo argues next that the trial court's limitations on Dr. Yanofsky's testimony violated his rights to due process, a fair trial, and to present a defense under the Fifth, Sixth, and Fourteenth Amendments.  Pet. at 33.  The trial court prevented Dr. Yanofsky from testifying that, "based on his examination and testing of [Gallardo], [Gallardo] would likely have confessed if he was guilty."  Id.  The California Court of Appeal held that the trial court properly limited Dr. Yanofsky's testimony because of an absence of adequate foundation.  Ans. Ex. F at 160.  The Court agrees.

A defendant's right to present relevant evidence "is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See Holmes, 547 U.S. at 324.

The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Egelhoff, 518 U.S. at 42. The defendant, not the government, bears the burden of demonstrating a violation of the principle. Id. at 47. "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" even though the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or are disproportionate to the ends that they are asserted to promote. Holmes, 547 U.S. at 324.

The California Court of Appeal reasonably held that the trial court did not err in limiting Dr. Yanofsky's testimony from "opining that, based on Gallardo's personality, he would be more prone to confess if he were guilty of the crimes in question." See Ans. Ex. F. at 158. In exercising its discretion and applying state evidentiary rules, the trial court found that Dr. Yanofsky "does not have expertise in police interrogations, tricky police interrogations, and the likelihood of the introverted defendant as it relates to which questions were asked of defendant when he gave statement to the police." Id. at 159. The trial court also held that there were foundation and expertise deficiencies, because Dr. Yanofsky "does not even know what questions were asked by the police. . .it matters little what Yanofsky's opinion is in this regard." Id. The California Court of Appeal held Dr.

Yanofsky's testimony would have been inadmissible.  Id.

Further, the trial court's limitation of Dr. Yanofsky's testimony was reasonable because the trial court afforded Gallardo the opportunity to "establish the foundation and establish the expertise of Dr. Yanofsky in this area (as an expert on who is likely to confess) . . ." even after initially denying Gallardo's motion in limine.  See Ans. Ex. A at 66.  Gallardo did not avail himself of this opportunity and failed to establish Dr. Yanofsky's expertise in the area.  See Ans. Ex. F. at 160.  The California Court of Appeal noted that "defense counsel advised the trial court she could not overcome the foundational hurdles necessary to question Dr. Yanofsky on the topic."  Id.  Thus, it was reasonable for the California Court of Appeal to hold that "the state court's rejection of [Gallardo's] claim was neither an unreasonable application of, nor contrary to, clearly established federal law. [Gallardo] is not entitled to habeas relief on this claim."  Id. at 163.

### 3. The trial court permitting testimony from an expert regarding CSAAS

Gallardo argues that the admission of "misleading expert testimony regarding CSAAS" violated his rights to due process and a fair trial.  Pet. at 43.  Gallardo argues that the expert testimony regarding CSAAS was misleading because "it created new misconceptions and colored them with the authority of reliable scientific evidence, even though CSAAS testimony is not reliable."  Pet. at 49.  The California Court of Appeal held that the trial court did not abuse its discretion in permitting an expert to testify about CSAAS because the testimony was for the limited purpose of disabusing the jury of misconceptions about how a victim of child sexual abuse reacts after an incident.  Ans. Ex. F at 163.  It also held that the trial court properly instructed the jury on how it should view the CSAAS testimony.  Id.  The Court agrees.

Where a trial court admits evidence that is "arbitrary or so prejudicial that it rendered trial fundamentally unfair," a federal court on habeas review may find a due process violation.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986), cert. denied, 479 U.S. 839 (1986).

Admission of evidence violates due process where it enables the jury to make impermissible inferences and where the evidence is "of such quality as necessarily prevents a fair trial." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Only when the admitted evidence injects an "element of unfairness" can it be "inferred that the jury must have used the evidence for an improper purpose." Id.

Expert testimony on CSAAS is admissible "when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." See Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003). Brodit rejected "the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony." Id. Additionally, trial courts admitting expert testimony on CSAAS mitigate concerns of violating a defendant's due process rights when they provide a "cautionary instruction" to the jury. Id.

Here, Ms. Wolf's testimony was not likely to lead the jury to make impermissible inferences. Neither party asked Ms. Wolf whether she thought Gallardo had committed the offenses. Id. Ms. Wolf answered "no" when the prosecution asked whether she would be able to tell the jury if Gallardo was guilty or not. Id. at 12–13. Ms. Wolf's statements were sufficiently general and addressed general misconceptions about children who are victimized by family or family-like individuals. See id. at 16. Ms. Wolf's statements described the characteristics of a hypothetical perpetrator, and were "not used to opine that a specific child [was] telling the truth." See Brodit, 350 F.3d at 991.

Further, Ms. Wolf's testimony was not likely to lead the jury to make impermissible inferences because the trial court provided a cautionary instruction to the jury. See Brodit, 350 F.3d at 991. The trial court specifically cautioned the jury that the testimony about CSAAS "must not be considered by you as proof that the alleged victims' molestations or rapes is true." Ans. Ex. B at 6. The trial court went on to say that the jury should consider the testimony on CSAAS to the extent that "the alleged victims' reactions as demonstrated by the evidence are not inconsistent with them by having been molested or raped." Id. at 7. The trial court's admission of CSAAS evidence was consistent with the limited purpose

for which it is admissible. See Brodit, 350 F.3d at 991.

The trial court was also reasonable to permit Ms. Wolf's testimony because CSAAS evidence does not necessarily prevent a fair trial. See Jammal, 926 F.2d at 920. Expert testimony on CSAAS is admissible. See Brodit, 350 F.3d at 991. Ms. Wolf did not bolster the credibility of any of the child victims because the trial proceedings informed the jury that Ms. Wolf did not interview the witnesses, know any of the specific details of the case, or know if any of the alleged facts actually occurred. See Ans. Ex. B at 7.

Therefore, the California Court of Appeal was reasonable in holding that there was "no abuse of discretion in admitting the CSAAS evidence and . . . that the jury was properly instructed on how to evaluate that evidence." See Ans. Ex. F at 164.

### 4. The trial court's exclusion of evidence of Victim 1's prior sexual history

Gallardo argues that the trial court violated his rights to due process, a fair trial, and to present a defense under the Fifth, Sixth, and Fourteenth Amendments when the trial court excluded evidence of Victim 1's prior sexual history. Pet. at 52. On February 11, 1994, Victim 1 told her mother that her mother's boyfriend, Sergio Tabares, was molesting Victim 1 and Victim 2. Ans. Ex. F at 165. Police investigated the accusation against Tabares and Tabares confessed to it. Id. The government charged Tabares with sexually assaulting Victims 1 and 2, which allegedly occurred between September 1, 1993 and February 6, 1994. Id. Tabares pleaded guilty to sexually assaulting one of the victims between September 1, 1993 and February 6, 1994. Id. The trial court dismissed the other charge regarding the second victim. Id.

Gallardo argues that Victim's 1 prior sexual history was relevant to her credibility for two reasons. Pet. at 52. First, Gallardo asserts that Victim 1's prior sexual history explained an "alternative source of injuries or physical evidence." Pet. at 52. Petitioner's second theory is that the evidence "provided an alternative source of sexual knowledge by a child of [Victim 1's] age." Id. The California Court of Appeal held that the trial court properly excluded the evidence because Gallardo's theories were "speculative at best."

Ans. Ex. F at 167. The California Court of Appeal reasoned that "there was no evidence the Tabares molestation occurred before [V]ictim 1 reported Gallardo's molestation in September 1993," and that Gallardo's theories assumed that "[V]ictim 1's knowledge of sexual terms came from Tabares' molestation of her." Id. The Court agrees.

A trial court violates "traditional and fundamental standards of due process" where it excludes evidence that is "trustworthy" and "critical" to the defense. Chambers v. Mississippi, 410 U.S. 284, 302 (1973). Chambers "clearly established that the exclusion of trustworthy and necessary exculpatory testimony at trial violates a defendant's due process right to present a defense." Cudjo v. Ayers, 698 F.3d 752, 754 (9th Cir. 2012).

As discussed above, a defendant's right to present relevant evidence "is not unlimited, but rather is subject to reasonable restrictions." Scheffer, 523 U.S. at 308. The exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." Id.

Here, the trial court did not violate Gallardo's rights to due process, a fair trial, and to present a defense because the excluded evidence of Victim 1's prior sexual history is neither "trustworthy" nor "critical." See Chambers, 410 U.S. at 302. The evidence is not trustworthy because of its speculative nature. See Ans. Ex. F at 166–67. Petitioner theorizes that had the trial court permitted evidence about Tabares' molestation of Victim 1, the jury could have inferred that Victim 1 "learned about sexual activity from someone other than [Gallardo]." Pet. at 53. As the California Court of Appeal noted, "there was no evidence the Tabares molestation occurred before Victim 1 reported Gallardo's molestation in September 1993." Ans. Ex. F. at 166–67. Moreover, Victim 1 was 11 years old when she made the report against Gallardo and could have obtained knowledge about sexual activity from "a variety of sources, such as sex education at school, discussions with her friends or with her mother." See id.

Moreover, Gallardo's argument about Victim 1's prior sexual history is not trustworthy. Id. It is arguably unlikely that a victim of child sexual abuse would have confided in her own sexual abuser about another sexual abuser. Id. In addition, it is

unlikely that Victim 1 would have reported Gallardo but not Tabares if it were true that Tabares had molested Victim 1 prior to Victim 1's initial report against Gallardo on September 10, 1993.  Id.  Victim 1 reported being raped by Gallardo, but in Victim 1's later case against Tabares, she reported being "touched."  Id.  It is unlikely that Victim 1 learned about "rape" from Tabares when Victim 1 never accused Tabares of rape.  Id.

Further, evidence of Victim 1's prior sexual history was neither "critical" nor "necessary exculpatory testimony."  See Chambers, 410 U.S. at 302; see also Cudjo, 698 F.3d at 754.  Assuming the truth of Gallardo's claim that Tabares had sexually molested Victim 1 in the summer of 1993, which was prior to the initial police report on September 10, 1993, it does not preclude the possibility that Gallardo raped Victim 1 between 1989 and 1990.  Pet. 54.  Because both events could be true, the Tabares molestation fails to exculpate Gallardo.  See id.; see also Chambers, 410 U.S. at 302.  It was therefore reasonable for the California Court of Appeal to hold that there was "[n]o error in excluding evidence of victim 1's subsequent molestation."  Ans. Ex. F. at 164.

### 5.    Cumulative errors

Gallardo argues that he is entitled to habeas relief because there were cumulative errors that violated his rights under the Fifth, Sixth, and Fourteenth Amendments.  Pet. at 55.  The California Court of Appeal held that Gallardo's claim of cumulative error fails because Gallardo "failed to show any error that infringed his due process rights."  Ans. Ex. F at 167.  The Court agrees.

Where there are multiple trial errors, the "cumulative effect of multiple trial errors 'can violate due process even where no single error . . . would independently warrant reversal.'"  United States v. Preston, 873 F.3d 829, 835 (9th Cir. 2017) (quoting Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007)).  The cumulative effect of several errors may still prejudice a defendant so substantially that his conviction must be overturned.  Id. at 831.  Where the state court did not commit a single constitutional error, nothing can accumulate to the level of a constitutional violation.  See Hayes v. Ayers, 632 F.3d 500,

524 (9th Cir. 2011); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Here, because Gallardo fails to establish a single constitutional error, he is not entitled to relief on his cumulative error theory.

**III.    CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.[7] Pursuant to Rule 11 of the Rules Governing § 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because it cannot be said that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS SO ORDERED.**

Dated: February 21, 2019

CHARLES R. BREYER
United States District Judge

---

[7] Petitioner requests an evidentiary hearing to develop the above-mentioned claims. Pet. at 20–21. Petitioner fails to establish a need to clarify issues of fact. Therefore, the request is DENIED.